**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                    No. 05-4381

FRANK WILLIAMS,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(CR-04-82-WDQ)

Argued: May 26, 2006

Decided: August 21, 2006

Before WILKINSON and WILLIAMS, Circuit Judges,
and Glen E. CONRAD, United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Wilkinson and Judge Conrad joined.

## COUNSEL

**ARGUED:** Martin Gregory Bahl, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. A. David
Copperthite, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.
**ON BRIEF:** James Wyda, Federal Public Defender, Greenbelt,

Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

Frank L. Williams appeals his conviction for being a felon in possession of a firearm in violation of 18 U.S.C.A. § 922(g)(1) (West 2000), and his sentence of 235 months' imprisonment imposed under the Armed Career Criminal Act, 18 U.S.C.A. § 924(e) (West Supp. 2006). As to his conviction, Williams contends that the district court erred by conditioning the admission of an evidentiary demonstration he wished to perform on his willingness to testify, an error that he argues improperly enabled the Government to introduce the names of his prior convictions despite the fact he had stipulated to his felon status. We agree that the district court erred, but we conclude that the error was harmless. As to his sentence, Williams contends that the district court erred by making findings of fact with regard to his criminal history. We disagree. For the reasons that follow, we affirm.

I.

On October 18, 2003, Officers Gene Molinaro and Jack Atkins of the Baltimore City Police Department arrested Williams for selling counterfeit music compact disks (CDs) and digital video disks (DVDs). According to the officers, Officer Molinaro discovered a gun in Williams's waistband during a search of his person after the arrest. It was later determined that Williams had several prior felony convictions, and Williams was indicted under § 922(g)(1) in the United States District Court for the District of Maryland.

Williams elected to go to trial. Prior to trial, he stipulated that he was a convicted felon so that the name and nature of his recent prior convictions — a 1991 conviction for possession with intent to distribute heroin, a 1995 conviction for possession with intent to distribute heroin and cocaine, and a 1995 handgun conviction — would not be introduced to the jury. *See Old Chief v. United States*, 519 U.S. 172,

185 (1997) (holding that Fed. R. Evid. 403 prohibits the Government from introducing the "name or nature" of a prior felony conviction in a § 922(g)(1) case when such information would tend to "lure a juror into a sequence of bad character reasoning" regarding a defendant who had stipulated to his felon status).

The prosecution called Officers Molinaro and Atkins to testify at trial. These officers testified that on the day in question, they were in a marked patrol car on a routine patrol that took them past the Upton Courts apartment complex, an area fraught with crime. As they slowed for traffic, Officer Molinaro saw Williams, who was sitting on a wall in front of the apartment complex, engaged in a transaction with a man on a bicycle. A large black bag was near Williams and he was offering CDs to the man on the bicycle with one hand while reaching with the other hand for cash from the man on the bicycle. Suspecting that Williams was illegally selling CDs, the officers stopped their patrol, got out of the car, and approached Williams. As the officers approached, the man on the bicycle rode away. Officer Molinaro asked Williams if he had a vendor's license, and when Williams answered in the negative, he was placed under arrest. Officer Atkins handcuffed Williams, and Officer Molinaro directed Williams to sit on the curb. Officer Molinaro turned his attention to Williams while Officer Atkins inspected the black bag.

Officer Molinaro testified that Williams was wearing a fanny pack and that the fanny pack was zipped closed at the time of his arrest. As Williams sat on the curb, Officer Molinaro unclipped the fanny pack to remove it. At that time, Officer Molinaro observed that the fanny pack was unzipped and the compartment was open. Officer Molinaro further noticed that Williams's underwear was pulled high above the waist of his pants so that it covered a square bulge. Pulling the underwear back, Officer Molinaro found a handgun. Officer Molinaro suspected that Williams originally had the gun in his fanny pack and, after his arrest, transferred it to his underwear. Officer Atkins discovered counterfeit DVDs and CDs in the black bag.

Williams represents — and the Government does not seriously contest — that, having stipulated to his felon status, he did not intend to testify at trial. During cross-examination of Officer Molinaro, however, Williams sought to demonstrate to the jury that he could not

have been wearing the fanny pack because its belt was too short to close around his waist. The Government objected to the demonstration, arguing that "any demonstration . . . would be testimonial" and that Williams would, therefore, be subject to cross-examination if he performed it. (J.A. at 143.) The district court sustained the Government's objection, providing two reasons for its ruling: (1) that the demonstration was a testimonial act and, accordingly, Williams could not perform it without subjecting himself to cross-examination and (2) that the demonstration was inadmissible because Williams had gained a significant amount of weight after he was arrested and, therefore, the demonstration was irrelevant to show that Williams was not wearing the fanny pack at the time of his arrest.[1]

After the Government rested its case, Williams sought clarification of the district court's ruling with respect to the demonstration. In explaining its decision, the district court suggested that, despite the fact it found that Williams had gained weight since his arrest, Williams would be able to perform the demonstration if he would be willing to subject himself to cross-examination on the issue of his weight. The Government informed Williams that if he chose to testify, it would seek to impeach his testimony by introducing the name of the three aforementioned prior convictions. At that time, the district court expressed doubt that the prior handgun conviction would be admissible to impeach Williams.

Williams called his wife as the opening witness in his case in defense. She stated that she had driven Williams to the apartment complex and that, at the time he got out of the car, he was not wearing a fanny pack or carrying a black bag or gun. Mrs. Williams went into

---

[1]The court instructed counsel that he could not use the defense of "[i]f the belt doesn't fit, you must acquit." (J.A. at 145.) The district court was apparently referring to a memorable scene from the 1995 murder trial of O.J. Simpson. A bloody glove had been found at the crime scene, and the prosecutor wanted Simpson to put on the glove in front of the jury. Simpson tried to put on the glove, but it was too small. In his closing argument, Simpson's attorney, Johnnie Cochran, told the jury, "If it doesn't fit, you must acquit." Closing Argument of Johnnie Cochran, *California v. Simpson*, No. BA097211, 1995 WL 697930, at *50 (Cal. Super. Ct. Sept. 28, 1995).

the apartment complex to visit her granddaughter and Williams stayed outside. Later, someone informed Mrs. Williams that her husband was being arrested in the street. She left the building to see what was going on and observed one of the officers (presumably Officer Molinaro) talking to her husband as he was handcuffed and seated on the curb and the other officer (presumably Officer Atkins) removing DVDs, CDs, and a gun from the black bag.

During a break in Mrs. Williams's testimony, Williams again sought clarification with respect to the district court's ruling on the demonstration. This time, the district court stated what it had suggested in its second explanation of its ruling: "If [Williams] wants to take the stand, he can put . . . on [the fanny pack]. . . . That's actually the only way you get the demonstration, because then the Government gets to cross-examine as to whether the circumstances of the demonstration are sufficiently similar to what [they were at the time of Williams's arrest]." (J.A. at 239.) The district court also ruled that, based on the testimony that had been presented to that point, the Government could not introduce the name of the handgun conviction as impeachment because its probative value did not outweigh its prejudicial effect. The district court also stated, however, "I don't know what he's going to testify to on direct, and then the direct is going to determine the scope of the cross[-examination]." (J.A. at 244.) After Mrs. Williams testified, Williams's counsel sought clarification from the district court on whether, if Williams testified, the Government could impeach Williams's testimony with the name of the handgun conviction. The district court responded, "it depends on what [Williams] says about a gun." (J.A. at 264.)

Williams decided to take the stand. He tried on the fanny pack, but it was approximately six inches too short to close around his waist. Williams also testified regarding his weight change (or lack thereof) since the time of his arrest. Williams, however, did not limit his testimony to his weight change. Instead, he gave testimony regarding the events surrounding his arrest. According to Williams, he was sitting on the wall in front of the apartment complex when a man on a bicycle approached him offering to sell him DVDs and CDs. The man showed him the DVDs and CDs, and about the same time, the man on the bicycle saw Officers Molinaro and Atkins in their patrol car and rode off. According to Williams, he (Williams) was not wearing

the fanny pack, he was not selling the DVDs and CDs, the black bag did not belong to him, and he did not have the gun. Williams also stated that he had a prior drug conviction.

On cross-examination, the prosecutor briefly questioned Williams regarding his weight change since the time of his arrest. Williams also admitted, in response to questioning from the prosecutor, that he had two prior drug convictions. The following exchange then ensued:

| [Prosecutor]: | Okay. Are you telling the ladies and gentlemen of the jury you have no knowledge of this gun? |
|---|---|
| [Williams]: | Yep. |
| [Prosecutor]: | Are you telling the ladies and gentlemen of the jury you did not intend to possess this gun? |
| [Williams]: | Yep. |

(J.A. 278-79.) The prosecution then asked Williams about the handgun conviction. Williams admitted that he had pled guilty to a crime involving a handgun.

The case was submitted to the jury, which returned a guilty verdict. At sentencing, the district court determined that Williams's criminal record classified him as a Armed Career Criminal and sentenced him to 235 months' imprisonment. *See* 18 U.S.C.A. § 924(e). Williams noted a timely appeal, challenging both his sentence and conviction. We address his arguments in turn.

## II.

Williams contends that his proposed demonstration was not testimonial evidence and, accordingly, the district court erred by excluding the demonstration unless he took the stand. The Government argues that "[t]he district court properly denied [the] proposed in-court demonstration [because] there was no evidence showing that the

facts were substantially similar, [and therefore the demonstration was not] relevant to the issues at trial." (Appellee's Br. at 5.) We review for abuse of discretion the district court's evidentiary rulings. *See United States v. McMillon*, 14 F.3d 948, 954 (4th Cir. 1994). A district court abuses its discretion when it commits an error of law. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

A.

For a courtroom demonstration to be admissible as evidence, the proponent of the demonstration, like the proponent of any evidence, must show that the demonstration is relevant. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 425 (4th Cir. 1996). A courtroom demonstration that purports to recreate events at issue is relevant if performed under conditions that are "substantially similar to the actual events." *Id.* (internal quotation marks omitted). In a related context, we have stated that

> [i]f there is substantial similarity, the differences between the [demonstration] and the actual occurrence ordinarily are regarded as affecting the weight of the test evidence rather than its admissibility . . . . On the other hand, the differences between the [demonstration] and the actual occurrences may be such that the trial judge is justified in concluding either that the evidence is totally lacking in probative value as to any material issue, or that the probative value of the evidence is overborne by the danger that introduction of the evidence will tend to confuse the issues, unnecessarily prolong the trial, or create a likelihood of undue prejudice. In such cases, it is proper to exclude the evidence. . . .

*Renfro Hosiery Mills v. Nat'l Cash Register Co.*, 552 F.2d 1061, 1065 (4th Cir. 1971) (addressing admissibility of the results of out-of-court experiments) (internal citations omitted).

The Government urges us to review the district court's ruling that the demonstration was inadmissible unless Williams agreed to be cross-examined under this "substantially similar" paradigm. We do not perceive, however, that the district court's final evidentiary ruling

on the demonstration was based on its conclusion that the demonstration was irrelevant due to Williams's weight gain. Although the district court initially ruled that the demonstration was not relevant, and therefore inadmissible, the district court ultimately admitted the demonstration when Williams agreed to testify. Accordingly, the district court necessarily reconsidered its earlier conclusion that the demonstration was irrelevant; otherwise it would not have admitted the demonstration. We therefore evaluate the district court's ultimate ruling — that the demonstration was admissible as evidence only if Williams took the stand — according to the district court's alternate conclusion that the demonstration was a testimonial act.

B.

Implicit in the district court's ruling that the demonstration was a testimonial act that would subject Williams to cross-examination is the view that a defendant who offers "testimony" is subject to cross-examination, while a defendant who offers only "nontestimonial evidence" is not subject to cross-examination. Federal Rule of Evidence 611(b) supports this view. *See* Fed. R. Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."). While Rule 611(b) primarily sets limits for the "[s]cope of cross-examination," *id.*, the first sentence of the Advisory Committee's Notes on Rule 611(b) presupposes that cross-examination is only proper when a witness testifies. *See* Fed. R. Evid. 611(b) 1972 advisory committee's note ("The tradition in the federal courts and in numerous state courts has been to limit the scope of cross-examination to matter *testified* to on direct [examination], plus matters bearing on the credibility of the witness." (emphasis added)).

Without attempting to provide an exhaustive definition of the term "testimony" in this context, we think it clear that a physical demonstration such as the one Williams proposed here is not "testimony" and, accordingly, that such a demonstration does not subject its proponent to cross-examination under Rule 611(b). Among the primary purposes of cross-examination are to "test the [testifying] witness' perceptions and memory [and to] impeach, *i.e.*, discredit, the [testifying] witness." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). In the case of a physical demonstration, the proponent of the evidence does not

express any perceptions or memory that could be tested, nor does he make any assertions that could be discredited. Rather, he simply presents his body, often coupled with an accouterment, as evidence to the jury. In such a situation, there simply is nothing to cross-examine.

To be sure, when one party conducts a physical demonstration the other party is entitled to introduce evidence of his own that tends to show that the demonstration does not accurately portray what it purports to represent. Such evidence is a proper response to the admission of a physical demonstration, as is cross-examining a witness who offers testimony that the demonstration accurately portrays what it purports to represent. But it is illogical to say that a defendant opens himself up to cross-examination simply by virtue of performing a physical demonstration. Such a holding is tantamount to the strange conclusion that a demonstration *itself* can be cross-examined.

Our conclusion that a defendant who offers a demonstration is not subject to cross-examination under Rule 611(b) is buttressed by cases interpreting the Fifth Amendment's Self-Incrimination Clause. The text of the Self-Incrimination Clause provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. The Supreme Court has held that this Clause "protects an accused only from being compelled to *testify* against himself or otherwise provide the [Government] with evidence of a testimonial or communicative nature. . . . " *Schmerber v. California*, 384 U.S. 757, 761 (1966) (emphasis added).

In *Holt v. United States*, 31 S. Ct. 2 (1910), for example, a question arose at trial as to whether a blouse belonged to the defendant. A witness testified for the Government that the defendant had put on the blouse and that it fit. *Id.* at 6. The defendant argued that the witness's testimony should not have been admitted under the Self-Incrimination Clause because he had tried on the blouse under duress. *Id.* The Supreme Court rejected this argument, stating that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Id.*[2]

---

[2]Building on this principle, the Supreme Court has held that a defendant who is required to provide a blood sample used at trial, *Schmerber*

Based on this distinction between physical characteristics of the defendant and the content of his communications, this and other courts have routinely upheld as consistent with the Self-Incrimination Clause in-court demonstrations requiring a defendant to modify his appearance or to don clothing known to have been worn by the person who committed the offense. *See United States v. Turner*, 472 F.2d 958, 959 (4th Cir. 1973) (requiring the defendant to wear a wig and sunglasses); *United States v. Valenzuela*, 722 F.2d 1431, 1433 (9th Cir. 1983) (requiring the defendant to shave); *United States v. Lamb*, 575 F.2d 1310, 1316 (10th Cir. 1978) (same); *United States v. Murray*, 523 F.2d 489, 492 (8th Cir. 1975) (requiring the defendant to wear a wig); *United States v. Roberts*, 481 F.2d 892, 894 (5th Cir. 1973) (requiring the defendant to put on a stocking mask worn during the robbery). If a defendant who is compelled to don clothing before the jury does not "testify" for purposes of the Self-Incrimination Clause, it would seem to follow, *a fortiori*, that the Self-Incrimination Clause also provides that a defendant who voluntarily dons clothing before the jury may not be required to subject himself to cross-examination. *See United States v. Bay*, 762 F.2d 1314, 1315-16 (9th Cir. 1985) (holding that the district court erred in concluding that a defendant was required to take the stand to display his tattoos because the Government may compel a defendant to display such physical characteristics).[3]

---

*v. California*, 384 U.S. 757, 761 (1966), supply a handwriting sample used at trial, *Gilbert v. California*, 388 U.S. 263, 266-67 (1967), appear at a pre-trial line-up and speak words allegedly uttered by a bank robber, *United States v. Wade*, 388 U.S. 218, 222 (1967), and provide a voice exemplar to a grand jury, *United States v. Dionisio*, 410 U.S. 1, 7 (1973), does not offer testimony for purposes of the Self-Incrimination Clause.

[3]Although Williams references the Self-Incrimination Clause at various places in his brief, he neither argues nor cites any authority for the proposition that the district court's ruling conditioning the admissibility of the demonstration on his willingness to take the stand "compelled [him] to be a witness against himself" in violation of the Self-Incrimination Clause. We therefore do not consider the argument. *See* Fed. R. App. P. 28(a)(9)(A) (providing that "[t]he appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant

We therefore conclude that a physical demonstration performed before the jury is not, without more, "testimony" that subjects the demonstrator to cross-examination under Rule 611(b). In requiring Williams to subject himself to cross-examination as a condition to admitting his demonstration, the district court erred.

C.

Our conclusion that the district court erred does not, of course, end the matter, for we must assess the effect of the district court's error on Williams's trial. Because the district court's error was not a constitutional one, *see* Part II.B. and fn. 3, we would normally review the error under the standard set forth in Rule 52(a) of the Federal Rules of Criminal Procedure. *See United States v. Ince*, 21 F.3d 576, 582 (4th Cir. 1994). Regardless, we think the government has met its burden of proving this error harmless, even if we assume for purposes of argument that it was of constitutional dimension. *See Chapman v. California*, 386 U.S. 18 (1967). A court performing harmless-error review may not substitute its own judgment for that of the jury. Our own views are irrelevant; we may uphold a conviction under *Chapman* only when we conclude "beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 19 (1999). This requires "a case-by-case determination," *Williams v. Zahradnick*, 632 F.2d 353, 361 (4th Cir. 1980), after examining "the record as a whole to determine the probable impact of the improper evidence on the jury," *id.* at 360. For statutory

---

relies"); *United States v. Smith*, 441 F.3d 254, 274 (4th Cir. 2006) (applying Rule 28 in criminal case).

Instead, Williams argues that the district court's ruling conditioning his ability to perform the demonstration on his willingness to be subjected to cross-examination violated his Sixth Amendment right to a fair trial. *See Washington v. Texas*, 388 U.S. 14, 19 (1967) (holding that a state defendant has a Sixth Amendment right, guaranteed by the Fourteenth Amendment's Due Process Clause, to compulsory process for obtaining witnesses in his favor). This argument is entirely without merit. Absent direction from the Supreme Court, we will not use the Sixth Amendment's generic right to fair trial to constitutionalize the Federal Rules of Evidence.

violations, Congress adopted a somewhat more forgiving test than the constitutional one, providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a); *see also* 28 U.S.C. § 2111 (2000). Under any test, a judge in "grave doubt as to harmlessness" must treat an error as harmful. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995); *see id.* at 437-38. Since this is not such a case, however, and the error qualifies as harmless under even the constitutional test, the jury's verdict need not be overturned.

Williams argues that he was prejudiced by the district court's error because it was only by virtue of the fact he took the stand that the Government was able to introduce the names of his three prior convictions. He further contends that the jury was likely to have assumed, without considering whether the Government had proved its case, that because he had three prior convictions — one of which was for a handgun offense — he possessed a gun outside the apartment complex. *See Old Chief*, 519 U.S. at 185 (noting that "the risk of unfair prejudice [is] especially obvious" when a defendant is charged with being a felon in possession of a firearm and the name or nature of a prior gun conviction is introduced into evidence).

This is a unique case. In most cases involving an erroneous evidentiary ruling, the error itself results in the admission of inadmissible evidence — the district court incorrectly interprets a Rule of Evidence and the Government is able to introduce inadmissible evidence. Here, however, the district court's error did not alone result in the introduction of the name of Williams's prior convictions into evidence. Under the district court's ruling, Williams could have declined to take the stand, in which case the name of his prior convictions would have been inadmissible. Instead, Williams decided to take the stand, a decision that created the possibility that the name of his prior convictions would be admitted into evidence.

We are unable to say, however, that Williams brought upon himself all harm that may have resulted from his decision to take the stand, because the district court presented him with a Hobson's choice: Williams could either (1) take the stand and demonstrate the fit of the fanny pack, thereby opening himself to cross-examination, or (2) not take the stand and be free from cross-examination but forgo perform-

ing the demonstration. Because, as discussed, Williams was entitled to perform the demonstration without taking the stand, we cannot fault Williams for choosing the former option.[4]

This conclusion, however, does not mean that all of Williams's choices are irrelevant to our harmlessness evaluation. While Williams made his decision *to take the stand* in the context of the district court's improper either/or, the district court did not impose a similar either/or with respect to *the scope of Williams's testimony*. In other words, while the district court's Rule 611(b) ruling unduly influenced Williams's decision to take the stand, once Williams decided to take the stand, he was free to say as little or as much as he pleased. Indeed, while the district court incorrectly conditioned Williams's ability to perform the demonstration on his willingness to take the stand, the district court never suggested that, once on the stand, Williams would have to testify about anything other than the fit of the fanny pack.

This distinction is an important one. Although the Government was able to introduce as impeachment evidence the name of Williams's prior *drug* convictions based solely on his decision to take the stand, *see* Fed. R. Evid. 609 ("For the purpose of attacking the credibility of a witness . . . evidence that an accused has been convicted of . . . a crime [punishable by death or imprisonment in excess of one year under the law under which the witness was convicted] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused. . . ."), the district court explained to Williams that the name of his prior *handgun* conviction would be admissible only if the scope of his direct examination was broad enough that the handgun conviction would be a proper subject of cross-examination. Unlike the name of his prior drug convictions, the Government was not able to introduce the evi-

---

[4]We also cannot fault Williams for introducing evidence of the name of one of his prior drug convictions on direct examination instead of waiting for the prosecution to bring out such evidence on cross-examination. Once Williams made the choice to testify, revelation of the names of the drug convictions was inevitable. In this situation, we will not hold against Williams the tactical decision to soften the blow of the evidence of the name of one of his prior drug convictions by bringing it out on direct.

dence of Williams's prior handgun conviction simply by virtue of the fact that he testified; instead, and as the district court twice explained to Williams, the Government was able to introduce the evidence of his handgun conviction because Williams testified that he did not possess a handgun on the day in question. *See* Fed. R. Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."); Fed. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts . . . may . . . be admissible [to show] proof of . . . intent [or] knowledge . . . .").

   In assessing whether Williams was harmed by the district court's error and the consequent admission into evidence of the name of Williams's prior handgun convictions, we believe it is relevant that he evidently considered himself better off by testifying that he did not have a gun on the day in question rather than limiting his testimony to matters relating to the fit of the fanny-pack. This choice, which Williams made with full awareness of both his ability to limit his testimony and the consequences of failing to do so, reflects a calculation of the costs and benefits of his options that courts are not prohibited from taking into account. We need not blind ourselves to Williams's own assessment that it was better for him to present to the jury his side of the story — despite the risk that the Government would introduce the name of his prior handgun conviction — than it would be for him to remain silent on this issue. To hold otherwise would both ignore the fact that Williams presented his version of the events to the jury and reward him for exacerbating the very error about which he now complains.[5]

---

[5]We hasten to add that we do not hold that a defendant's trial-related decisions that have the effect of exacerbating any harm that may arise from an erroneous ruling will always be relevant to a harmless error analysis. Such a holding would fail to account for the fact that appellate review of a criminal trial occurs in judges' chambers with the benefit of the transcript of the completed trial, while the trial itself actually unfolds in a courtroom before counsel. In short, we must guard against expecting counsel to perform at trial as if they had already read its full transcript and had the time to ponder every implication to the district court's rulings. In this case, however, the district court clearly informed counsel that although Williams would be subject to cross-examination if he conducted the demonstration, evidence of the name of the prior handgun conviction would not be admissible unless the scope of the direct examination was broad enough that such evidence would be a proper subject of cross-examination.

This conclusion, when combined with four other considerations, convinces us that the district court's error here was harmless. First, the prosecutor made mention of Williams's felon status in his opening remarks and introduced the stipulation of the same into evidence at the close of the Government's case-in-chief. The fact that the jury already knew of Williams's felon status when it heard the names of his prior drug and handgun convictions mitigates any damage that may have been caused by the introduction of those names. *See, e.g.*, *United States v. Ray*, 688 F.2d 250, 254 (4th Cir. 1982) (finding no harm from admission of evidence concerning "undisputed matters already proven in the record").

Second, while the prosecutor mentioned Williams's prior convictions twice in his rebuttal argument — on one occasion to argue that Williams was, in fact, a convicted felon, and on the other occasion to argue that Williams's testimony was not as credible as the officers — on neither occasion did the prosecutor argue that Williams's prior convictions indicated that he had a bad character or that because he had a firearm before, he must have had the firearm this time. *Cf. United States v. Madden*, 38 F.3d 747 753-54 (4th Cir. 1994) (concluding that erroneous admission of evidence that defendant used drugs was not harmless where prosecutor made extensive reference to the evidence in his closing argument in order to portray the defendant as a bad person).

Third, not one but two police officers provided consistent accounts of how they arrested Williams and found a firearm in the waistband of his underwear. By virtue of the district court's error, Williams was able to testify and present his side of the story to the jury, but the jury evidently believed the officers's testimony. The fact that the fanny pack did not fit Williams at trial does not seriously undermine the officers' accounts. Williams does not contest that, based on the evidence in the record, the jury could have reasonably concluded that Williams was heavier at trial than he was at the time of his arrest. Moreover, whether Williams was wearing a fanny pack is tangential to the crime for which he was being tried. To be sure, Officer Molinaro testified that Williams was wearing the fanny pack at the time of his arrest. But even if Williams was correct that he could not have been wearing the fanny pack, the jury was nonetheless unpersuaded

that the two officers lied in order to secure the conviction of a man they had never even met before.

Fourth, to the extent any potential for prejudice existed, the district court instructed the jury that it could not consider Williams's criminal past as evidence of guilt. We have held that such instructions mitigate the possibility of prejudice from improperly admitted evidence of the defendant's criminal history because "[w]e generally follow the presumption that the jury obeyed the limiting instructions of the district court." *United States v. Francisco*, 35 F.3d 116, 119 (4th Cir. 1994); *see also Ince*, 21 F.3d at 582 ("[W]e recognize the presumption of cure by a court's instruction . . . .").

In light of these considerations, we conclude that the Government has met its burden of establishing harmlessness. The jury's knowledge of the name of Williams's prior handgun conviction is, at least in part, attributable to Williams's mistake of not limiting his testimony to the fanny pack. But even if we disregard this mistake, it is difficult to see how the jury would have returned a different verdict if Williams had demonstrated the fanny pack without being subjected to cross-examination. To be sure, there was potential prejudice in the jury's knowledge of the names of Williams's prior convictions. *See Old Chief*, 519 U.S. at 185. But the prosecution did not exploit the potential for prejudice so as to cause harm to Williams, and the district court appropriately gave a limiting instruction to the jury about the use of the convictions.

In sum, considering the facts and circumstances of this case, the government has met its burden of establishing harmlessness. It is difficult to see how a jury would return a different verdict when the defendant's full assault on the officers' accounts did not persuade the jury in this case. While the district court's ruling was in error, the jury would hardly have ruled for a defendant who said nothing to dispute the officers' testimony just as it did not rule for a defendant who attacked it. The Supreme Court has cautioned against using the harmless-error doctrine "[t]o set a barrier so high that it could never be surmounted," because doing so "would justify the very criticism that spawned the harmless-error doctrine in the first place: 'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'"

*Neder*, 527 U.S. at 18 (quoting Roger Traynor, *The Riddle of Harmless Error* 50 (1970)). Since it is clear "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error," *id.*, we need not remand this case for a second trial.

## III.

Williams also contends that the district court committed Sixth Amendment error by sentencing him as an Armed Career Criminal because his prior convictions that formed the basis of his Armed Career Criminal status were not alleged in the indictment or proven to the jury. He argues that despite the fact the Supreme Court held, in *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998), that the Constitution is not offended by judicial factfinding relating to the existence of a prior conviction, subsequent cases — and in particular *United States v. Blakely*, 124 S. Ct. 2531 (2004), *United States v. Booker*, 125 S. Ct. 738 (2005), and *Shepard v. United States*, 125 S. Ct. 1254 (2005) — have undercut *Almendarez-Torres*'s reasoning.

This argument warrants little attention. In *United States v. Cheek*, 415 F.3d 349 (4th Cir. 2005), we rejected the argument that the Supreme Court overruled *Almendarez-Torres*, impliedly or otherwise. *Id.* at 352. We adhere, as we must, to *Cheek*, and conclude that the district court fact-finding at sentencing was consistent with the Sixth Amendment.

## IV.

For the foregoing reasons, we affirm Williams's conviction and sentence.

*AFFIRMED*